Argued September 8, reversed November 5, 1958, petition
for rehearing denied January 7, 1959

# KELLEY *v.* PARK VIEW APARTMENTS

330 P. 2d 1057

*Earle P. Skow*, and *James Arthur Powers*, Portland, argued the cause and filed a brief for appellants.

*Dwight L. Schwab* argued the cause for respondent. On the brief were Hutchinson, Schwab & Burdick, Portland.

ROSSMAN, J.

This is an appeal by the two defendants from a judgment in the sum of $10,629.10 which the circuit court entered against them in favor of the plaintiff for an injury which he sustained March 6, 1956, when he fell upon a public sidewalk on Southeast 18th Avenue, Portland, in front of an apartment house in which he lived and which is owned by the defendant-appellant, Park View Apartments, Inc. The other defendant-appellant, Myrtle Brown, is the manager of the apartment house. The complaint charged the defendants with negligence. Park View Apartments, Inc., owns and operates nine structures, which with lawns cover four blocks. Plaintiff's fall occurred at 8:30 o'clock in the morning near the entryway of the apartment house in which he lived. He swore that he slipped

upon a thin patch of ice upon the public sidewalk, and claims that the ice formed during the night from moisture that had seeped down from a remnant of snow which remained upon a sloping lawn of the apartment house property.

Defendants' brief submits eight assignments of error. The second charges that the circuit court erred when it denied defendants' motion for a directed verdict. We will now consider it.

The apartment house in which the plaintiff and his wife resided was seven feet or so west of the sidewalk line and 70 inches higher than 18th avenue. A sloping lawn descended from the apartment house level to the sidewalk. An entryway on the 18th avenue side of the structure served, not only the plaintiff's apartment, but also others. From it six concrete steps led to the sidewalk. On both sides of the steps there were concrete curbs of the familiar kind. To the right (south) of one who descended the stairway there was an iron handrail. The latter was supported by two uprights, the lower ends of which were imbedded in the south curb.

The plaintiff claims that in the afternoon of March 5 moisture from the remnant of snow that remained on the sloping lawn next to the south side of the steps trickled down upon the public sidewalk where, in the course of the night, it froze into ice. He swore that March 6, at 8:30 a. m., as he left for his work he slipped upon a small patch of ice upon the public sidewalk at that place.

Several days prior to the plaintiff's injury, snow had fallen in Portland, but the evidence does not disclose the day when it fell nor its depth. Mrs. Edna Kelley, the plaintiff's wife, gave virtually the only

testimony which revealed the depth of the snowfall. After describing the snow as "wet", she continued:

"Q Was there enough to cover the sidewalks?
"A Well, apparently.

"Q Well, was there . . . ?
"A Yes.

"Q There was. All right. How deep did it cover the sidewalks?
"A Well, I didn't measure it.
* * *

"Q Would it be fair to say it would be an inch?
"A I couldn't say.
* * *

"Q And do you remember how long the snow lasted before it started to melt? I am referring to this time of March 6th.
"A At March 6th I recall that there was no snow anywhere along our bank except by our steps."

By the expression "our bank" Mrs. Kelley referred to the sloping lawn which extended from the apartment house level to the public sidewalk.

After the snow had fallen, L. W. Cook, a janitor in the employ of the defendant-appellant Park Avenue Apartments, Inc., removed it from the concrete steps and cast it to the south of the steps; that is, beyond the side equipped with the iron handrail.

Mrs. Kelley, a few minutes before 8:00 o'clock the morning of the accident, left the apartment in which she and her husband lived for her place of employment, about a block and a half from the apartment house. She departed by the entryway which we have described and descended the steps. She then turned to the right, the same as the plaintiff did a half hour later when he

left for his work. She saw no ice or snow on the sidewalk or steps and did not slip. We quote from her:

"Q And how about the bank? Was there any ice or snow on the bank?

"A No."

It is agreed that the steps were free of ice, snow and moisture on the morning of the 6th. Mrs. Kelley testified that on March 5, at 5:00 p. m., when she returned to the apartment from her place of employment there was no snow upon the sidewalk or upon the bank except a residue "right next to the stairway" by the iron handrail. The weather on March 5, according to her, was "clear and warm."

After her husband's injury Mrs. Kelley returned immediately to her home and shortly examined the place where he fell. She found a small patch of ice on the sidewalk at that place. According to her, "it came right down where this snow had been piled." By the expression "where this snow had been piled" she referred to the fact that after the snowfall employees of the apartment house who cleared the steps cast the snow upon the side of the inclined lawn next to the handrail. No one indicated the amount of the snow which was cast.

The public sidewalk was six feet wide and sloped downward an inch and a half toward the street curbstone. It also sloped to the north.

L. W. Cook, the janitor previously mentioned, as a witness for the plaintiff, testified that at 7:00 a. m. on March 6 he descended the steps and walked upon the public sidewalk where an hour and a half later the plaintiff fell. He swore that his foot slipped on the sidewalk immediately adjacent to the place where the step's handrail terminated. He then examined the

sidewalk and found a thin covering of ice which he described as follows:

"* * * the ice started right at the corner of the steps and seemed to run across the sidewalk at an angle—not much of an angle but a little angle there, and I guess it was about from—oh, I would say six or eight inches wide at one end and at the closest to the steps, I don't know, it would have been two or three inches wide or maybe one."

It was upon that patch of ice that the plaintiff slipped.

Mrs. Kelley drew upon a photograph of the stairs a representation of moisture which she swore she saw upon the sidewalk when she returned home in the evening of March 5. It extended across the walk from the base of the staircase rail to the other side of the walk. It corresponds in size with the description given by the janitor that we quoted. As thus depicted, the patch of ice was possibly two or three inches wide near the corner of the stairs where the handrail terminated and broadened to six or eight inches at the other edge of the sidewalk. The ice, according to Mrs. Kelley, was "very thin, transparent," and added, "you had to look" in order to notice it.

Mrs. Kelley testified that on the morning of the 6th no snow remained upon the 18th avenue sidewalk nor upon the sloping lawn except a remnant adjacent to the south side of the steps beyond the handrail. The evidence gives scant impression of the size of that remnant, as we see from the following testimony given by her:

"Q  And as I understood you to say, on the 5th all of the snow had melted off but one little bunch?
"A  That's right.

"Q  And that is the way it was when you went to work on the morning of the 5th?
"A  On the morning of the 5th, yes, sir.

"Q Yes. And it hadn't changed its condition any although it had been warm all day long, when you came home?

"A Well, naturally, I suppose it had melted some.

"Q Well, it isn't what you suppose. I am asking you, Mrs. Kelley.

"A Sure, it had melted some.

"Q I see; but it hadn't melted it?

"A No."

Mr. Cook testified that at about 7:20 a. m. of March 6, he began to throw rock salt with which the defendant-appellant Park View Apartments had provided him "on the sidewalk in front of the apartment which I lived in and Mr. Brown." Mr. Brown is the husband of the defendant-appellant Myrtle Brown. Neither Cook's apartment nor the Browns' faces on 18th. Cook testified that shortly after he had begun to scatter salt, the defendant-appellant Myrtle Brown told him that "there was no use putting salt on because the sun would take the ice away in a short time." He thereupon discontinued scattering salt. According to him, he told Mrs. Brown at that time that "it was slippery on 18th street and it was slippery in the back and on 16th street." He did not, however, tell Mrs. Brown of the ice which he had encountered in front of the plaintiff's apartment.

We have not mentioned the testimony given by the plaintiff. Our omission has been due to the fact that he has very poor eyesight and made no effort to describe the ice upon which he fell. He explained:

"I have no front vision, just side vision. I can't see straight ahead at all. I have side vision only. I can't read."

After he had fallen he groped with his hands and thereby encountered the icy area which caused his fall.

We see from the foregoing that alongside the south curb of the steps a remnant of snow remained on the afternoon of March 5 and the morning of the 6th. The above narrative also indicates that the ice upon which the plaintiff slipped was upon the public sidewalk below the remnant of snow. A jury could reasonably infer, so we believe, that the moisture which froze into ice by the morning of March 6 came from the melting remnant and that the latter included snow which the defendants' janitors had cast there while cleaning the steps.

■ The parties seem to agree that an adjoining land-owner owes no duty to keep a public sidewalk free from a natural accumulation of snow and ice, but that he has a duty to use reasonable care to avoid increasing the danger by causing an unusual accumulation of snow and ice upon the sidewalk. Many cases are cited where, through modification of the premises by the construction of ledges or cornices, or through provision for an unusual collection of or discharge of surface waters, the adjoining owner added to the hazard on the public sidewalk. In some of these, there was no showing that the modification made by the owner created the hazard, or there was a definite showing that the ice could have been caused by the natural accumulation of snow combined with pedestrian traffic over it. However, in almost all of these cases, there was a great deal of other snow which was still present at the time of the accident, a fact not in the present case. In some of the cases it was held that negligence was established, and in others that the landowner was not liable.

*Erven v. Eagy*, 152 Or 219, 53 P2d 53, holds:

"* * * Plaintiff was entitled to an instruction that these appellants, knowing the grade and the

> manner of construction of the sidewalk immediately in front of the entrance to the store, were obliged to exercise such care as an ordinary, careful, prudent person would exercise in not creating a hazard or adding to the danger of pedestrians who might use the sidewalk, by placing thereon, or, if so placed, in not removing therefrom, any matter that would cause a slippery or dangerous condition."

Both parties seem to agree that this is a correct statement of the law. In that case, the defendants were charged with depositing upon the smooth, sloping sidewalk in front of their store "a certain substance, which, when wet, became slippery."

As will later appear, an imposition of liability in this case would virtually demand that the court employ a rule of strict liability. In fact, the instructions told the jury:

> "* * * if you find that the defendants piled snow on the embankment adjacent to the stairway leading to plaintiff's apartment, and that such condition created a hazardous or dangerous condition, then defendants would be guilty of negligence."

The concept of strict liability was early employed in the law, but was soon superseded by a rule of liability based on fault. Harper and James, The Law of Torts, § 12.1 et seq. However, the concept of strict liability was carried over in some specific areas, such as innkeepers and dangerous animals. In the English law, the present-day principle of strict liability hinges largely on *Rylands v. Fletcher*, LR 1 Ex 265, LR 3 HL 330, where a landowner was held liable for damage to the plaintiff's property when water from a reservoir which he had constructed escaped through an abandoned mine shaft and flooded the plaintiff's mines. The court took the view that one, who, in an "un-

natural" use of his land brought something upon it, held it at his peril and was liable to anyone who was injured by its escape. In this country, the doctrine was accepted by some courts and rejected by others, but, in general, where used was confined to dangerous activities on the land. Harper and James, at page 788, enumerate nine situations where strict liability is imposed, among them blasting cases, aircraft cases, the Rylands type of case and some kinds of nuisances. *Ure v. United States*, 93 F Supp 779; *Brown, Adm'x. v. Gessler*, 191 Or 503, 230 P2d 541, and *Bedell et ux. v. Goulter et al*, 199 Or 344, 261 P2d 842, are three recent decisions which determined the extent to which the rule of *Rylands v. Fletcher* was applicable to Oregon conditions. The Ure decision, after declaring that from an early period this court gave approval to the doctrine of the Rylands case, stated: "There is probably no opinion in which that court squarely applied the principle."

In the Brown case, an owner of a city lot, preparatory to improving it with a building, dug a basement which became filled with rain water. The latter in turn flooded a neighbor's land. The doctrine of *Rylands v. Fletcher* was rejected because the excavation was temporary, the water was not stored intentionally and the excavation was a reasonable use of the property. Liability was sustained, however, through the application of the rule of ordinary negligence. The Bedell case was based upon extensive blasting operations. It embraced the doctrine of *Rylands v. Fletcher*.

At least one American case used the idea of "escaping at one's peril" to impose liability on a landowner for ice formed from water which escaped from snow piled on his premises, though the element of

negligence was retained. In *Aull v. Lee*, 84 NJL 155, 85 A 1018, the court said:

> "* * * if, for his own convenience or benefit he undertakes to store snow, which has fallen in another place upon his own property, he is responsible for any injury which might reasonably be expected to result therefrom."

But this blanket statement was modified by the court through its quotation of the following from 28 Cyc 1439:

> "* * * But an abutting owner * * * may be liable for a special or peculiar injury caused by his own artificial accumulation of snow or ice upon the sidewalk, as by the discharge of water at times when the natural result would be to form ice. The liability is confined as to what a reasonable man might anticipate, and the owner is required to do only what is reasonably necessary to prevent injury."

In accord with these views, the court held that the complaint stated a cause of action. However, this view did not meet with subsequent favor in the New Jersey courts. It was distinguished in *Arning v. Druding,* 96 NJL 47, 114 A 158, where the court held that there was no liability when the piling of snow resulted from clearing the public sidewalk, since, in that instance, it was not done for the convenience of the landowner but for the public. The court thought that the defendant's liability should not be extended through his performance of a gratuitous act. In *Taggart v. Bouldin,* 111 NJL 464, 168 A 570, the court specifically overruled *Aull v. Lee,* though, again, the snow had been shoveled from the public sidewalk and was piled along the street and on defendant's property where it melted and refroze on the walk. This opinion emphasized the fact that the acts of the defendant did nothing to in-

crease the danger to pedestrians, but, on the contrary, lessened it. In detail, the court said:

"* * * The action of the defendant, in having the sidewalk shoveled off, introduced no new element of danger; rather the opposite resulted, and the danger was lessened. Had the snow been left on the sidewalk, the warmth of the sun would have melted that snow as well as that which fell upon the lawn, converting it into water which, when the temperature fell, would have frozen, rendering the sidewalk equally, if not more, dangerous to pedestrians, and, if the plaintiff under those conditions had fallen and sustained injuries, she would have no cause of action. Sewall v. Fox, 98 NJL 819, 28 ALR 1357. Since this be so, to hold a property owner answerable in damages, for injuries received because an effort is made to keep the sidewalk clear and to reduce the danger to pedestrians, would result in a hardship and injustice. No duty existed at common law to keep the sidewalk in front of one's premises free from ice and snow. Cf. Sewall v. Fox; no duty arises by statutory enactment, and consequently, no breach of duty or actionable negligence arose here, where the defendant, property owner, cleared the sidewalk by having the snow shoveled off, some towards the curb and some towards or over the property line."

■ Sometime after this case, the Massachusetts court had occasion to consider a situation where snow cleared from the defendant's premises melted and ran over the public sidewalk, there refreezing and forming ice on which the plaintiff fell. *Cooper v. Braver, Healey & Co., Inc.*, 320 Mass 138, 67 NE2d 657. The court, relying in part on the Taggart opinion, stated:

"* * * The plaintiff contends that piling the snow where, if it melted, water would be discharged upon the sidewalk could be found to be negligence. An owner of land has a right to clear off the snow from his front yard and steps and to deposit it in

a pile away from the sidewalk. The piling of the snow is not shown to have artificially created a condition that increased or changed the direction of the flow of water upon the sidewalk from what it would have been on the natural slope of the land if the snow had not been shovelled. The defendant did nothing to confine the water into a definite channel or to accelerate its flow to the public way. In these circumstances, the mere flowing of water from the defendant's premises and the formation of ice upon the sidewalk do not show negligence upon the part of the defendant. There was no error in directing a verdict for the defendant."

We believe that the holding just quoted represents the proper view of the obligations of the adjoining owner. Admittedly, the rule is different where the owner has created an artificial condition on his land which causes water to be discharged onto the public sidewalk, with some cases refusing to impose liability where the plaintiff cannot show that the drainage from defendant's property was the sole cause of the accident. These cases and the general rule are covered in an annotation in 34 ALR 409, where many cases of defective downspouts and conductor pipes intentionally discharging water on a sidewalk or retaining walls, awnings and the like, are cited and discussed. These cases cover obviously artificial conditions, such as structures built and maintained by the adjoining owner. A good treatise, Snow and Ice, by John T. DeGraff, 21 Corn L Q 436, explores the same field with stress upon the law of New York. In one case, the drainage was from a retaining wall through "weep holes" and a drainage spout, but the court held that the defendant was not liable. *Jessup v. Bamford Bros. Silk Mfg. Co.*, 66 NJL 641, 51 A 147. It stated:

"* * * The erection of * * * the retaining wall by the defendants did not have the effect of in-

creasing in any degree the flow of the surface water, or of causing it to be discharged in any greater quantity upon the sidewalk. It merely concentrated the flow in certain places upon it. This concentra- tion was a necessary incident of the legitimate bene- ficial user of their property by the defendant, and any injury arising therefrom is not actionable."

While this case goes far in the area of structures, its reasoning is applicable to the contention that the con- centration present in the instant case was not an arti- ficial condition for which the defendant should be liable.

■ It remains to reconcile the Cooper case, supra, with the outline of duty of the adjoining owner as ex- pressed in *Erven v. Eagy,* supra. In the first place, that case involved a foreign substance, soapy water that ran down from windows which were being washed. Its essence was something like the "artificial conditions" that are caused by overhanging structures and drain- age spouts. Harper and James, supra, in § 16.9, set out three factors for determining whether particular conduct is negligent, once a duty to use care has been established. These are (1) the likelihood of harm; (2) the seriousness of the possible injury; and (3) the value of the interest to be sacrificed. They further state, at page 969:

"The court will also take the negligence issue from the jury whenever it is satisfied that all rea- sonable precautions have been taken—that is, when it thinks reasonable men could not prescribe a standard of conduct of which the actor fell short."

In our view, the likelihood of any increased danger from removing the snow from the steps and casting it beside them on the grass is so remote that it could not have been foreseen by a reasonable man. To the

contrary, the natural and probable consequences of such action, according to our belief, would be a lessening of danger, for, if the snow had been allowed to remain on the steps, it would not only have increased the danger to those using them, but, with no ground below it to sink into, all of the melting snow would have coursed down the concrete steps (which had curbs on their sides) and perhaps formed ice on the walk. Plaintiff argues that all of the snow would have melted by the morning of March 6 if that which was removed from the steps had not been thrown upon the adjacent grassy area. We do not believe that the argument is sufficient to take the case out of the rule of natural causes, nor that the defendants should have been expected to have foreseen that such an event could happen.

■ Similarly, we do not feel that defendants' failure to have removed the ice from the walk, once it was discovered, imposed any liability on them, since the cause of the ice was the nonnegligent act of defendants. They had no reason, when they cast the snow which they removed from the steps onto the sloping lawn, to infer that more moisture would make its way from it to the sidewalk than if the snow was permitted to remain upon the concrete steps where, upon melting, it would be bound to run to the sidewalk. Further, their act would fall under the general lack of any duty to clear the public sidewalk.

The plaintiff argues that the defendant could have piled the snow along the curb [possibly thereby increasing the danger on the public walk as the snow melted] or could have carted it away. Either course would have involved great effort when one bears in mind the fact that the apartment houses, covering as they did four city blocks, had numerous stairs similar

to the one which we described. The plaintiff's suggestions do not seem to be reasonable or practical burdens to impose on one who undertakes to make a way safer by removing snow and ice from it. In *Riccitelli v. Sternfield*, 1 Ill 2d 133, 115 NE2d 288, the defendant, operator of a filling station, cast some of the snow which he removed from his property onto piles which the city's snowplows had forced in part upon the public sidewalk. The defendant cleared a path along the latter. The snow adjacent to the walk melted at times and then refroze. The plaintiff fell upon the ice. The plaintiff in that case submitted the same contention as the plaintiff in the one before us. The court stated it as follows:

"* * * the plaintiff has argued that adding snow from his place of business to the piles of snow created by shoveling the walks has produced an artificial as opposed to a natural hazard which, in turn, has created a liability."

In affirming the appellate court, which reversed judgment entered by the trial court for the plaintiffs, the Illinois Supreme Court adopted the following statement made by the appellate court:

"* * * The general assumption is that the industry displayed by citizens in removing snow after a snowfall is desirable, if not necessary. The water which froze and produced the lump of ice on which plaintiff fell, came from natural causes. It cannot be said to have arisen from anything defendant did, other than removing the snow obstructing his driveway and making a path for pedestrians. That in so doing he may have piled some snow from the driveway onto the piles banked along the walk is not the type of act upon which liability in a case of this character may be predicated."

Finally, there is authority for the proposition that defendants owed no greater duty to the plaintiff be-

cause he was their tenant. *MacGregor v. Tinker Realty Co.*, 37 NJSuper 112, 117 A2d 45, held that where a tenant slipped on a public sidewalk cleared by an employee of the defendant, no special duty existed by virtue of the tenant-landlord relation.

As this resolves the issues in favor of the defendants upon their motion for a directed verdict, no consideration need be given to the other assignments of error.

Reversed.